We have 6 cases on the calendar this morning, 3 patent cases, 1 from the District Court and 2 from the Patent Office, 2 cases from the Court of Federal Claims and 1 from the Systems Protection Board. The last one and one of the claims cases are being submitted on the briefs and will not be argued. Our first case is Cleveland Clinic v. True Health Diagnostics, 2016-17-66. Mr. Rosenberg. May it please the Court. The District Court below failed to undertake several necessary steps in this case and the legal analysis it did perform was erroneous. This Court should reverse for 3 independent reasons. First, in this case it was necessary to undertake claim construction, to look at the claims individually, to look at factual development and to fully consider the prosecution history and the Court's failure to do that below was reversible error. Second. But look, we review decisions, not opinions. And when I look at, say, claim 11 of 552, it's a method of assessing the risk of cardiovascular disease comprising comparing, which is a mental step, comparing the level of myeloperoxidase with control subjects wherein, this is a result, wherein the levels of myeloperoxidase relative to comparable body samples are indicative. I mean, how is that different from Mayo? So it's different from Mayo in a number of respects. First of all, in Mayo, the discovery at issue was really not a discovery. The idea of using these thiocurine drugs for treating anti-immune disorders was known in the art. Everyone in the art knew that if you gave too little of the drug, it was going to be ineffective. And too much of the drug, you were going to have side effects. So we look at claims rather than what's behind them, whether one was a discovery and one was not. If there was a discovery here, then perhaps it could have been claimed as a new method of determining something involving physical steps, but it wasn't. But it is, because the determining facets here include using conventional methods for an entirely new purpose. Nobody in the art knew that you could use any of the techniques claimed, and many of them are specifically claimed in the dependent claims. No one knew you could use an immunological technique like an ELISA, flow cytometry, or mononuclear antibodies to measure MPO mass activity or oxidation products in the blood for the purpose of diagnosing CVD. This is very much like the rapid litigation case. In that case, there was a discovery that liver cells could be repeatedly frozen, and the inventors applied that by using conventional freezing techniques, but doing it in a new way to preserve the liver cells. That is exactly what we have here, a new discovery that MPO in the blood can be used for the purpose of determining laboratory methods that nobody were able to use for this purpose. Let me start with step one. You argue instances where you say CCS stated that claims are directed in an eligible subject matter. Correct. But there's no reasoning accompanying those assertions. We've stated that skeletal or undeveloped arguments are waived on appeal. Show me in the record where CCS made an argument that was more than skeletal or undeveloped. In the brief below, if you look at appendix 3349 to 50, in the introduction to the brief below, the lawyers, it's appendix 3349 to 50. Let me just read you the key passage. It says, the MPO testing patents claim a non-routine way of measuring and using MPO to achieve a new and useful result. Contrary to True Health's arguments, these patents are not merely a discovery of a law of nature. The USPTO found on multiple occasions that the MPO testing patents innovatively cover non-routine techniques for seeing, measuring, and applying MPO. The claims of the patents combine determining, comparing, and measuring levels of MPO activity, MPO mass, or both, with the use of results and predetermined values to predict risk of cardiovascular disease. This was a marked improvement over the then state-of-the-art methods measuring MPO. Simply put, Cleveland Clinic invented a specific way to see MPO and a specific way to use the new result. None of this existed naturally, and no one had invented it before the Cleveland Clinic. While it isn't labeled step one, that is plainly a step one argument. And as this court has repeatedly said, step one and step two, particularly before the most recent cases from this court, like rapid litigation and McGrow, were often conflated. There was very limited proceedings in the district court below. There was a single brief that was 30 pages long. And the lawyers below did, in fact, say they were arguing step one and step two. But in the introduction, they explained the reasoning for the step one argument. This is not- Counselor, when I look at the claims, and I ask myself, what are the claims directed to? I just can't get away from the fact that it seems to me that the claims are directed towards the use of MPO in human samples in order to predict cardiovascular disease. Right, but- You're using MPO to predict cardiovascular, and you're saying that, well, what's novel here is that we get a better result. No, what's novel here is that nobody knew to even do this beforehand, and they didn't know how to do it. The prior-art Terletzkaya method, which was the only thing that looked at MPO in the blood for purposes of CVD, taught away. Terletzkaya said if you had heart attacks, your MPO levels would be lower than healthy subjects, because they used a different method for analyzing MPO. So let's assume that being able to see the MPO is a groundbreaking discovery. How does this get you past Ariosa? It gets us past it because it's not just being able to see it. It's using techniques that were not known in the art for doing it. In Ariosa- No, you're taking me to step two. No, okay, step one. I'm sorry. Yeah, what are the claims directed- Because it's directed to an application. It's like rapid litigation. It's not directed to simply observing the natural phenomenon. It's directed to a new method, a new laboratory method. That's what using these techniques, the ELISA, the flow cytometry, the mononuclear antibody tests. These are all tests defined in the specification and in the dependent claims that the district court never looked at that specifically say these are techniques you can use to do this. That's why it's like rapid litigation. And then you add to that, Judge Reyna, the whole comparing methodology. I would submit there is no case that this court or the Supreme Court has ever said fails 101 with anything like the comparing methodology you have here. This was a methodology that had to be fully derived using- If all you do is look at A and B, but here you have to develop through experimentation, the control methodology. Here you have to- I mean, the inventors looked at thousands upon thousands of samples to initially determine what could be a comparison level. And then as the specification teaches, they dynamically adjust those levels when new data is obtained. It's not just looking at DNA strand number one and DNA strand number two. It's a completely new method. One critical point here- Hang on a minute. Back about four pages in the transcript, you seemed to be saying that the district court erred by not addressing certain claims. So in effect, that it erred by treating certain claims as representative. Correct. You make that argument in your blue brief at 28. But CCF only made a general objection to the selection of representative claims. It basically said the claims- It said the claims are not representative, and you had to look at the dependent claims. And then it used a couple of for-examples, and it used the claim that specifically talks about an immunological technique. How are the ones that aren't addressed not waived on? They're not waived because it was a general objection to using representative claims. And it says each dependent claim has to be reviewed. And then it just said a for-example. I mean, part of the problem was- And this is what I was getting at. There's only a single life sciences case where this court or the Supreme Court has ever upheld a dismissal on a 12b6. And that was the Muriel case. And in Muriel, there was a single claim at issue that the parties had stipulated to, and no claim construction dispute whatsoever. Here, below, we argued, number one, these claims were not representative. You had to look at the dependent claims. And that there were several critical claim terms that had to be construed, including comparing, determining, and predetermined value. And what I was getting at with the control group, that is all in the definition and the specification for predetermined value. That is a critical part of this invention that is entirely human-made. Human beings have to figure out how to do the methods for this comparing step, for this control group. They chose statistical methods that are set forth in the specification. They used these statistical methods in evaluating thousands of samples in years of research. That is entirely human ingenuity. That is all in the patent under predetermined value description. And in the examples, for example, example one, in the 552 patent, none of that was examined by the district court. And all of that was implied by the arguments that were made below, you have to look at the claims individually. You have to construe the claims. Where in the record did CCF propose a construction that the district court did not adopt? They did not propose specific constructions below. And I think it is very difficult to force a party at the pleading stage to develop an entire claim construction. That is why we do Markman hearings. That is why we have a claim construction process. What they did do is identify the terms that needed construing, and explain in the brief, admittedly not the greatest detail because of the limited scope of the briefing, but they did explain that, for example, comparing includes this control group analysis. And if the court had... Did you propose any constructions? We did not propose specific constructions below. No. And I think that is the problem with doing this... Doesn't that leave the court at its discretion to pick which claim is representative and to proceed with the one-on-one analysis? I don't think so, Judge Rayner, because they specifically objected to both of those. They specifically said below, you can't look at the claims as representative because the dependent claims have new inventions, different inventions. And they said, these are the terms that require construction. And they put enough meat in the bone in that brief to explain why it was significant. What requires construction? These claims are in plain English. Comparing, wherein, leading to describing the result. Well, so if you look at the predetermined value portion of these patents, it goes through laborious detail, the statistical methods that are being used. I would direct the court's attention just for a minute. If you turn to the 581 patent, which is on Appendix 86, if you just take a look at Claim 5 of that patent, and I'm sorry to turn the court's attention to this, but if you look at this, you see both determining and comparing, but you have all of this additional detail and a list of these several oxidation products of MPO that can be measured and accounted for, which, by the way, no one in the prior even ever thought about looking at. This needs to be construed. I mean, you're talking about determining, and you've got this list of oxidation products, and you have to figure out how those things dovetail. That's why construction was so important. You, Judge Lurie, it may be plain English. Everybody else, not so much. So I think it has to be reviewed, and it has to be looked at carefully. I see I'm into my rebuttal time. Just one final point. Independently, the 260 inducement and contributory negligence claim should not have been dismissed, and certainly leave to amend should have been freely given. The court gave no reason not for leave to amend, and in the opposition to the motion to dismiss, the lawyers below specifically said we've got infringement contentions that we're attaching, and if you have any problems with the complaint, let us amend the complaint to add the infringement contentions. Judge Reina has a question. Sir. Just very quickly, Counselor, I'd like for you to address step two of the Ellis inquiry, especially because it seems to me that what we're dealing with here are well-known, existing, conventional steps. So if you get to step two, number one, you've got the ordered combination of new steps. You've got the detecting and measuring methods that I talked about before. Those are conventional. The detecting and the measuring are conventional. But not for this purpose. It's just like rapid litigation. They were used for other purposes. They were not used for this purpose. No one in the ARC ever thought to use them for this purpose. But then you add that whole comparing methodology. That's not conventional. That's a derived comparison analysis, and critically, Judge Reina. But if you're using, let's say, if you're using conventional steps for a conventional purpose, how can you say that they're being used for a new purpose? Step for detection or step for detection? Right. But nobody thought to detect MPO for the purpose of CVD. That may be true, but the steps you're talking about are conventional. But they're adapted here. I mean, all the steps almost are all involve something different. Yeah. They're detecting something different. Blood, serum, organisms. Yeah. But those specific tests, whether it's the ELISA, whether it's flow cytometry, they were used for other purposes. They were not used for these purposes, and they were adapted. In the specification, they tell you how to use these tests adapted for this particular purpose. And then you add the comparing methodology, the protocol, which requires you to use these methods to derive the values you use as the control. But if you use the Terlitz-Skyler method to derive the control values, it'll be completely inaccurate. OK. Thank you, Your Honor. Counsel, we'll give you two minutes for rebuttal time. I appreciate it. Thank you. Mr. Motchworth. Good morning, Your Honors. Would you speak? You addressed rapid litigation in footnote two of your brief. But speak to that first, OK? Yes. Yes, Your Honor. Rapid litigation was an application of a natural phenomenon. That's the important distinction. Rapid litigation was decided at step one. What the court said was not every claim that recites or includes a natural phenomenon is absolutely ineligible. But importantly, there must be a transformation of the natural law into patent-eligible subject matter. Now, the court gave two examples. There can be a new assay, a new measurement technique employed that can be in the event of step or there can be a treatment, a method of treatment, an application of the natural phenomenon. And that is where the court landed with respect to cell threat. In step one, it was not merely reciting that primary liver cells can be frozen and thawed multiple cycles. It was an application to create a preparation of cells that can be reused. With respect to step two, the court did go on to analyze step two. And what the court said was the conventional technique at the time was applying a single freeze-thaw cycle. So the techniques were standard, but they were only used once. And with respect to cells duress, those techniques were used in two cycles, twice. And that was different than the conventional techniques. Those facts, that analysis does not apply to this case. The claims here, the inventive contribution was the discovery of natural phenomenon. And whether it was an important discovery, it was the discovery of a correlation between a blood enzyme, MPO, and the risk of having or developing cardiovascular disease. Do you believe Arioso applies in this particular case? I believe Arioso applies. Explain why. So, Mr. Rosenberger at the end of his discussion brought up step two and the position that prior to this discovery, these techniques had never been used previously to measure MPO in blood and to predict atherosclerotic cardiovascular disease. As Arioso showed, step two removes the discovery from the analysis. And so the question at step two is whether the techniques apart from the discovery are against the conventional wisdom or non-routine. Here are the techniques using immunological techniques or paradox assays to measure activity were conventional and known. Creating control groups, which is not a claim limitation. No claim of the MPO testing patents requires creating... Your opponent says it may have been conventional or unknown, but they hadn't been used for the purposes asserted under step one. They had not been used for purposes of that discovery. That was the same... For seeing, yeah, the MPO. The technologies described in the specification, for example, measuring MPO by immunological technique had been used for MPO. And the inventors acknowledged that in the specification at the 552 patent column nine lines 30 through 33,  I guess I'm asking more just from a legal perspective. If we determine that steps or methods are conventional, well-known, does the fact that they're used in a different way, or like step one for the detection to see the MPO in this case, does that mean that they're no longer conventional or well-known that they pass step two? No, it does not, Your Honor. Consistent with this court's decisions in Ariosa, in genetic technologies, step two looks at the detecting, the comparing steps apart from the natural correlation, apart from the discovery. Those techniques were conventional. Well, step two, we say, well, okay, you didn't make it past step one. So what can you tell me now about the invention that's innovative, that's different, the inventive concept? So it seems to me that there could be a time when conventional and well-known steps are used in a way that is innovative. Yes, Your Honor. Or inventive, rather. And I think CellsDirect was an example of that. What the court said in CellsDirect in step two was, while the individual techniques... Why isn't it in this case? Because the techniques are being applied as they were applied to any other biomarker. The inventors, for example, cited to and incorporated a prior art patent looking at C-reactive protein into the specification of the 552 patent. It applied the same technique. C-reactive protein was a marker of inflammation of the arterial wall. Elevated levels were used to predict risk of cardiovascular disease. The framework of the claims are the same. Would there have been a patentable invention here if it had been claimed differently, such as a method of determining the existence of cardiovascular disease by carrying out a certain procedure to determine the myeloperoxidase level? Yes, Your Honor. I think there could have been if the steps to detect MPO were unconventional. So supposing I determined that blue eyes are a predictor and that the intensity of blueness is in fact that predictor, and there's a standard intensity of blueness chart, and I simply say, take a look, and you'll be able to determine patentable or not patentable. In light of Perkin-Elmer, Your Honor, I do not believe it's patentable. Perkin-Elmer was looking at markers of genetic defects, comparing those to standard ranges or standard values, and that comparison was ineligible for it. What could I do with that chart that would make it patentable? Claussen gives an example, another case decided by this court, where there were immunization schedules, and there was an application step of following a specific schedule based on what was detected. Here there could, for example, be application steps. Once observing the natural phenomenon, which is all the current claims recite, is there an application? Is there a method of treatment step added to those claims that could pass the 101 threshold, could be a transformative application? But even there, not all applications necessarily are transformative. It must transform the natural law into patent-eligible subject matter. So these claims, as this court has noted, as the Supreme Court has noted, once the inventors discovered the natural phenomenon, they were in a position to recite claims that provided an application of that natural law, but they stopped at reciting the natural law or observing the natural law. The Waring Clause simply instructs artisans to observe the natural phenomenon and there's nothing left to do. So when I come up with my blueness intensity detector, I may have some combined? Combined with additional application steps, yes, Your Honor. The law does not say, and we have not taken the position, that, again, every claim which recites or relies on in some capacity a natural phenomenon is absolutely ineligible. But just reciting the natural law isn't enough. There must be an application to transform the law into patent-eligible subject matter. And that's what was lacking here. And that's why the lower court correctly ruled. Now, method of treatment claims transform that which is treated with the treatment. But diagnostic claims examine what is there, what exists. Is it your view that diagnostic claims can never pass muster? Because they are determining the existence of a natural phenomenon? No, Your Honor. But diagnostic claims that use conventional techniques to observe a correlation and do not apply that correlation or do not have... So you're saying the use of non-conventional techniques renders a diagnostic claim patent-eligible? No, Your Honor. The use of non-conventional techniques... Non-conventional. Non-conventional techniques, Yes, Your Honor, may render diagnostic claims patent-eligible. And again, in Sells Direct, this court went on to step two and identified an example of an uncommon combination. So whether a combination is reversed or whether steps are performed twice when the prior art teachers only perform them once, that could be a sufficient inventive concept for a diagnostic claim to pass the 101 filter. The Patent Office, which understandably is not binding, provides examples in the instructions they give to examiners of using an assay that historically had been used in the veterinary sciences and applying it to human subjects or developing a new man-made antibody to detect the natural phenomenon. Those are examples, too, where that may provide sufficient inventive concept to allow for diagnostic claims to pass the 101 threshold. You mean a test used for veterinary subjects becomes patent-eligible if it is used for human subjects? It could be unconventional, to the extent that no one previously had used an assay, an antibody that was used, a porcine assay, in the veterinary sciences and used it for human subjects. Every human drug is tested on animals. Well, it's an example that, given the right facts, it could be an example of unconventional steps that are appended to or applied to a natural phenomenon that could pass step two of the Alice Mayo test. I'm happy to answer any additional questions that the court may have, but I thank the court for the time this morning. Thank you, Mr. Matcher. Mr. Rosenberg has two minutes. I think that what my worthy opponent just said effectively concedes the case. He says if you use unconventional methods for a new purpose, now his example was porcine or animal, but that's exactly what you have here. You have using these methods like flow cytometry that nobody ever thought to use for MPO analysis, and they applied it to a new purpose here, a new use. That's exactly what happened in the detecting steps. My opponent mentioned the C-reactive protein stuff. They didn't use techniques that were these techniques at all. They certainly didn't use flow cytometry. They didn't use mononuclear antibody analysis. He said, oh, if you use a man-made antibody, that's what this does. In some of the claims, it uses man-made mononuclear antibodies to do the analysis. I mean, the dependent claims, that's why it's so critical to look at these dependent claims individually, and that's what the district court didn't do. A determining step tells the doctor to determine the level of the relevant metabolites through whatever process the doctor or the lab wishes to use. Right, but then the dependent claims claim specific methods, and if you look back at the specification, they define the methods that are suitable, and so if there'd been claim construction of determining, one of the constructions, even of that broad independent claim, may have been determining by using a method such as flow cytometry, mononuclear antibody, or something similar. It would dramatically limit, it would dramatically reduce the possibilities. It wouldn't read a limitation into the claims, but it would instruct the physicians how to do it in a way that would actually work. That's why this is so different. My opponent mentioned kits, but in the specification here, there were specifically new kits that were developed that were suggested to be used by the physicians in performing this analysis. Finally, you asked about rapid litigation and Ariosa. As I said before, this case is very much like rapid litigation because it is using conventional methods for a new purpose. The freezing methods in rapid litigation were not new. They were just used for a new purpose. Thank you. Thank you, Mr. Rosenberg. Let's hope we all have the right MPO levels. We'll be happy to provide testing services. We'll take the case under advisement.